MIED (Rev. 03/11) Prisoner Civil Rights Complaint

| Official Use Only | | |
|---|---|---|
| Case Number | Judge | Magistrate Judge |
| | | |

Case: 2:26-cv-10233
Assigned To : Murphy, Stephen J., III
Referral Judge: Grand, David R.
Assign. Date : 1/21/2026
Description: PRIS JOHN DOE V WHITMER ET AL(SS)

# PRISONER CIVIL RIGHTS COMPLAINT

*This form is for use by state prisoners filing under 42 U.S.C. § 1983 and federal prisoners filing pursuant to Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971).*

## Plaintiff's Information

| Name | Prisoner No. |
|---|---|
| JUVENILE OFFENDER JOHN DOE | (SEE COMPLAINT) |

**Place of Confinement**

THUMB CORRECTIONAL FACILITY

| Street | City | State | Zip Code |
|---|---|---|---|
| 3225 JOHN CONLEY DRIVE | LAPEER | MI | 48446 |

Are there additional plaintiffs?   ☐ Yes   ☒ No

*If yes, any additional plaintiffs to this action should be listed on a separate 8½" x 11" sheet of paper and securely attached to the back of this complaint. You must provide names, prisoner numbers and addresses for all plaintiffs.*

## Defendant's Information

| Name | Position |
|---|---|
| HONORABLE GRETCHEN WHITMER | GOVERNOR |

| Street/P.O. Box | City | State | Zip Code |
|---|---|---|---|
| 141 S. CAPITOL AVENUE | LANSING | MI | 48933 |

Are you suing this defendant in his/her:   ☐ Personal Capacity   ☐ Official Capacity   ☐ Both Capacities

Are you suing more than one defendant?   ☒ Yes   SEE ATTACHED   ☐ No

*If yes, any additional defendants to this action should be listed on a separate 8½" x 11" sheet of paper and securely attached to the back of this complaint. You must provide their names, positions, current addresses and the capacity (personal, official or both) in which you are suing them.*

1

ADDITIONAL    DEFENDANTS

Heidi Washington, Director
Michigan Department of Corrections
Grandview Plaza
P.O. Box 30003
Lansing, Michigan  48909


Brian Shipman, Chairperson
Michigan Parole Board
Michigan Department of Corrections
Grandview Plaza
P.O. Box 30003
Lansing, Michigan  48909


Philip Granish, Psychologist
Lakeland Correctional Facility
141 First Street
Coldwater, Michigan  49036

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JUVENILE OFFENDER JOHN DOE,

      Plaintiff,

v.

GRETCHEN WHITMER; BRIAN SHIPMAN;
HEIDI WASHINGTON; PHILIP GRANISH;
& ALL OTHER CURRENTLY UKNOWN
PERSON(S) INVOLVED,

      Defendants.

Case No.: _____

Honorable: _____

**J U R Y   D E M A N D**

---

## LIST OF PREVIOUS LAWSUITS[1]

### EASTERN DISTRICT OF MICHGIAN

| | | | | | |
|---|---|---|---|---|---|
| 2:93-cv-71555 | John Doe v. Kitchen | Filed: | 04/14/93 | Closed: | 05/13/93 |
| 2:14-cv-12883 | John Doe v. Heyns | Filed: | 07/23/14 | Closed: | 09/24/18 |
| 2:17-cv-11627 | John Doe v. Winn | Filed: | 05/19/17 | Closed: | 05/25/21 |
| 2:18-cv-11471 | John Doe v. Washington | Filed: | 05/04/18 | Closed: | 05/17/18 |
| 2:18-cv-11430 | John Doe v. Whitmer | Filed: | 05/07/18 | Closed: | 12/21/22 |
| 2:23-cv-13075 | John Doe v. McDonald | Filed: | 12/05/23 | Closed: | 09/26/24 |
| 2:25-cv-10547 | John Doe v. Brownlee | Filed: | 02/26/25 | Status: | Pending |
| 2:25-cv-10142 | John Doe v. Artis | Filed: | 01/15/25 | Status: | Pending |
| 2:25-cv-13590 | John Doe v. Bush | Filed: | 11/12/25 | Status: | Pending |

### WESTERN DISTRICT OF MICHIGAN

| | | | | | |
|---|---|---|---|---|---|
| 2:91-cv-00230 | John Doe v. Osier | Filed: | 09/12/91 | Closed: | 01/30/96 |
| 1:93-cv-00034 | John Doe v. Vidor | Filed: | 01/13/93 | Closed: | 04/07/93 |
| 1:93-cv-00792 | John Doe v. Toombs | Filed: | 09/30/93 | Closed: | 01/22/96 |
| 1:93-cv-00944 | John Doe v. Voet | Filed: | 11/24/93 | Closed: | 09/14/94 |
| 2:00-cv-00183 | John Doe v. Bouchard | Filed: | 09/29/00 | Closed: | 08/06/03 |
| 2:05-cv-00267 | John Doe v. MDOC | Filed: | 11/03/05 | Closed: | 01/10/06 |
| 2:06-cv-00251 | John Doe v. Winn | Filed: | 10/02/06 | Closed: | 03/07/08 |
| 1:16-cv-00190 | John Doe v. Snyder | Filed: | 02/23/16 | Closed: | 08/21/20 |
| 1:16-cv-01068 | John Doe v. Corizon | Filed: | 08/29/16 | Closed: | 03/18/20 |

---

[1] The Plaintiff's name in the Previous Lawsuits section has been substituted for "John Doe" because Plaintiff is seeking to proceed pseudonymously.

- III -

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JUVENILE OFFENDER JOHN DOE,

      Plaintiff,

v.

GRETCHEN WHITMER; BRIAN SHIPMAN;
HEIDI WASHINGTON; PHILIP GRANISH;
& ALL OTHER CURRENTLY UKNOWN
PERSON(S) INVOLVED,

      Defendants.

Case No.: _____

Honorable: _____

**J U R Y   D E M A N D**

## C I V I L   R I G H T S   A C T   C O M P L A I N T

NOW COMES Juvenile Offender John Doe (John Doe), proceeding pro se pursuant to 42 USC § 1983 and all other applicable laws and statutes, and hereby files this Civil Rights Act Complaint against Gretchen Whitmer, Governor of the State of Michigan; Brian Shipman, Chairman of Michigan's Parole Board; Heidi Washington, Director of the Michigan Department of Corrections (MDOC), and Philip Granish, a Psychologist within the MDOC, and other Currently Unknown Person(s) involved, and for his causes of action alleges as follows:

### I N T R O D U C T I O N

1. This lawsuit challenges the failure of Defendants to account for the mitigating qualities of youth when assessing the recidivism risk of juvenile sex offenders. The procedures and questions used against John Doe, who is a juvenile sex offender, are the same as those used for adult sex offenders. That put John Doe at a severe disadvantage and opened him up to retaliation because, due to his lack of life experience that adults have, John Doe was unable to answer basic questions that adults are able to answer which are used

- 1 -

in the assessment process which ultimately determines whether offenders will be referred to sex offender therapy and granted parole.

2.    When considering whether to release a sex offender on parole, state officials create a document that assesses a sex offender's level of risk to commit another sex offense.  This is referred to as a Sex Offender Risk Assessment (risk assessment).  To determine this recidivism risk, those conducting the risk assessment ask a series of questions whose answers are then calculated to come up with a risk assessment factor.  These assessments and procedures were created for adult sex offenders.

3.    Particularly, the risk assessment process was created by Dr. Karl Hanson and a colleague to "assess the recidivism risk of adult male[s] with a history of sexual crimes", not offenders whom committed a sex offense under the age of eighteen (18) with no history of sex crimes, child sex abuse, or barely anything in the nature of sex whatsoever. Does v. Whitmer, 751 F.Supp.3d 761, 796 (E.D. Mich.2024).  Moreover, the psychologists used to conduct these risk assessments do not have training in child psychology nor get input from child psychologists or any other child experts, even though they have experience only in assessing adults.

4.    As a result, questions that normally adult offenders can answer, such as the amount of time they have been in a relationship or had sex, or whether they have been in a strip club, bar, or seen porn and other adult-style questions were counted against John Doe during his assessment process because he is unable to answer such questions.  Furthermore, this procedure can easily be used, as was done in this case, to retaliate against juvenile sex offenders.

5.    This lawsuit seeks equitable and injunctive relief to compel state officials to develop risk assessment procedures geared toward determining the recidivism risk of juvenile sex offenders.  The current procedures violate the

Due Process Clause, the Substantive Due Process component of the Due Process Clause, and John Doe's protected liberty interest in being meaningfully considered for release or parole based on demonstrated maturity and rehabilitation.

6.    In Greenholtz v. Inmates of Nebraska, 442 US 1 (1979), the U.S. Supreme Court held that adult prisoners do not have a right to parole. Id., at 11.  In talking about parole for adult offenders, the high court held that the fact "the state holds out the possibility of parole provides no more than a mere hope that the benefit will be obtained." Id.

7.    However, parole is different for juvenile offenders or for those whom were under the age of eighteen during the commission of the crime(s) for which they are serving prison sentences.  Following the U.S. Supreme Court's decision in Graham v. Florida, 560 US 48 (2010), federal courts all across the country have held that Graham created a protected liberty interest and a constitutional right in juvenile offenders being considered for parole at a meaningful time during their incarceration.  This applies to the procedures used by states to prepare a juvenile offender to be considered for parole.

8.    The reason for that is because children are constitutionally different from adults for purposes of how they are treated within a state's criminal justice system.  Indeed, the State of Michigan itself has considered this so serious that it has taken the extraordinary measure of providing greater protection for juvenile sex offenders when compared to those limited protections provided to adult sex offenders.

9.    For example, under Michigan's Sex Offender Registration Act, U.S. District Judge Mark A. Goldsmith found that juvenile sex offenders are only required to register as sex offenders if their adjudication is for the commission of an offense that would classify the individual as a Tier III

- 3 -

offender (see, MCL § 28.722(a)(iii)), which seems to include the conviction of offenses for gross indecency against a minor less than 13 years of age; kidnapping of a minor; leading away of a child under 14 years of age; criminal sexual conduct in the first, second, or third degree against a minor less than 13 years of age; sexual contact with a dead human body; and assault with intent to commit criminal sexual conduct (Id., at 28.722(v)(i)-(vii)). See, Does v. Whitmer, 751 F.Supp.3d 761, 812 (E.D. Mich.2024).

10. However, notwithstanding Michigan's greater protections for juvenile sex offenders in areas like those previously mentioned, it seems that Michigan, its parole board, and the MDOC has not made any distinctions between adult and juvenile sex offenders when conducting risk assessments that ultimately determines whether juveniles are meaningfully considered for parole. In fact, it seems that lower level employees, psychologists, and others who participate in that process have not developed any written procedures at all. Rather, they are permitted to create or make-up procedures as they go along in each case involving juvenile sex offenders. Moreover, it seems that risk assessors use this "grey area" to retaliate against those like the Plaintiff who, in their opinion, make "trouble" by seeking the intervention of federal courts into the manner that states treat juvenile offenders.

11. In addition to challenging acts of retaliation, this lawsuit challenges the lack of procedures and policies that govern the risk assessment process, as well as the lack of distinction between juvenile and adult sex offenders when assessing the risk of recidivism and the use of that determination during Plaintiff John Doe's parole interview and consideration.

### J U R I S D I C T I O N  &  V E N U E

12. This Court has jurisdiction pursuant to 42 USC § 1983, 28 USC § 1331, 28 USC § 1343(a)(3) and (a)(4), and 28 USC § 1367(a) because this action

- 4 -

involves a controversy that exceeds $10,000, seeks equitable relief, permanent injunctive relief, the costs to bring this action, and any other relief that the Court deems just.

13. Pursuant to 28 USC §§ 1391(a) and (b), venue is appropriate in the United States District Court for the Eastern District of Michigan.

## PARTIES INVOLVED

14. Plaintiff Juvenile Offender John Doe (John Doe) is a U.S. citizen and a prisoner who has been under the jurisdiction of the MDOC for nearly 40 years now. During a drug deal that went wrong, John Doe was convicted of a sex offense and other charges against a 27-year-old woman shortly after reaching his 17th birthday. He is currently residing at the Thumb Correctional Facility (TCF) located in Lapeer, Michigan. At all relevant times herein, John Doe was residing at TCF.

15. Defendant Gretchen Whitmer is the Governor of the State of Michigan. She is being sued in her individual and official capacities.

16. Defendant Heidi Washington is the Director of the Michigan Department of Corrections. She is being sued in her individual and official capacities.

17. Defendant Brian Shipman is the Chairman of the Michigan Parole Board. He is being sued in his individual and official capacities.

18. Defendant Philip Granish is a Limited Licensed Psychologist who seems to be a contractual employee with the MDOC. He is being sued in his individual and official capacities.

## GENERAL ALLEGATIONS & FACTS

19. Shortly after reaching his 17th birthday, Plaintiff John Doe was arrested and charged along with two adults in March of 1987 with armed robbery, criminal sexual conduct, and other offenses when a 27-year-old woman was

- 5 -

touched inappropriately during a robbery to collect a drug debt. The woman was penetrated with a finger in her vaginal area for two seconds. John Doe was recruited by two adults to participate in the robbery as a "lookout".

20. John Doe was charged as an adult, and after pleading guilty to some charges he was tried as an adult and convicted by a jury of the CSC offense along with a count of felony firearm. John Doe was subsequently sentenced as an adult to 42-60 years in prison in June of 1987, and has been in prison ever since. John Doe is now 56-years-old.

21. Just prior to sentencing, John Doe was evaluated by a field agent from the MDOC's Field Operations Administration (FOA), who prepared a pre-sentencing investigation report and compiled the sentencing guidelines range for the offense(s) of which John Doe stood convicted.

22. The field agent recommended a sentencing range to the sentencing judge of three-to-six years in prison for John Doe. The field agent also calculated what is known as a parole guideline score for John Doe and entered the score onto a Parole Guideline Data Entry form (Guidelines Data form) and filed it with the MDOC's Main Office. The parole guideline score determines a convicted defendant's probability of parole, which Plaintiff John Doe will discuss in a moment.

23. At the time that John Doe was convicted, Michigan had not yet created a Sex Offender Registration Act (SORA), a sex offender registry, or any laws or practices concerning sex offenses committed by minors or adults.

24. Therefore, when John Doe was being evaluated by the MDOC's FOA field agent, there was no recommendation that John Doe either participate in sex offender therapy or register as a sex offender, even though most sex offenders must now enroll in sex offender therapy before they are meaningfully considered for parole.

- 6 -

25. This is likely because the circumstances surrounding the case is actually about a drug deal rather than the commission of a sex crime, even though John Doe was sentenced to a longer term of imprisonment for the sex crime rather than the robbery and other charges.

26. Nonetheless, the field agent did evaluate the seriousness of the sex offense and other crimes that John Doe was convicted of, and calculated the sex offense as a low level offense and John Doe's recidivism risk also as being low.

27. Based on these assessments, John Doe did not qualify for sex offender therapy or any MDOC rehabilitation programming throughout his incarceration outside of those routinely recommended by the MDOC's Reception & Guidance Center (aka as "R&GC recommendations").

28. These R&GC recommendations included John Doe maintaining a routine work assignment in prison, completing his education by obtaining a General Equivalency Degree (GED), enrolling into Phase I Substance Abuse counseling, and enrolling into Career Technical Counseling.

29. John Doe completed all of his R&GC recommendations during the early part of his incarceration.

30. At some point after Michigan enacted its Sex Offender Registration Act (SORA), most sex offenders were required to enroll into sex offender therapy.

31. However, records indicate that John Doe was not required to enroll into sex offender therapy.

32. The official requirement for prisoners to enroll into sex offender therapy seems a mystery for the most part, because there are no published policies or procedures explaining the criteria for enrollment.

33. But, based on the general understanding within the prison

- 7 -

environment, the criteria for enrollment is determined by a prisoner's risk assessment, which is also seems marred in mystery.

34. According to Defendant Granish, prisoners are entitled to a copy of the report produced by psychologists after conducting a risk assessment, but are not entitled to review the materials used to determine or calculate and identify a prisoner's risk assessment.

35. In addition to being mysterious, risk assessments do not seem to be governed by any Michigan statute, nor a policy or rule developed by the MDOC.

36. However, while the risk assessment process is not particularly explained, it is generally understood that assessments are conducted shortly before a prisoner is scheduled to be considered for parole by the parole board, aside from the initial assessment conducted shortly after the offender is convicted of a sex offense.

37. Though not written in "stone", the other assessment, which will be referred to as the second assessment for lack of a better term, is conducted around a year before an offender is considered for parole.

38. According to psychologists contracted by the MDOC, the second assessment is conducted to determine whether anything has changed between the first assessment and the time of the second assessment.

39. Risk assessments involve levels of risk. At the initial stage, all prisoners convicted of a sex offense in Michigan undergo a risk assessment shortly after conviction of a sex offense. The assessment is used to determine the prisoner's recidivism risk to commit another sex offense, which appears to range from Low, Medium, and High risk levels, and, therefore, whether enrollment in sex offender therapy is needed or recommended.

40. So, whether or not an offender is recommended to enroll in sex offender therapy is central because it is used to assess an offender's risk to

- 8 -

society and, therefore, whether an offender's consideration for parole will be truly meaningful or rather perfunctory and subsequently denied.

41.   Particularly, if a prisoner has not been recommended to enroll into sex offender therapy or has been recommended and completes the therapy, that increases the likelihood of him receiving a meaningful consideration for parole which would likely be granted.

42.   In the same token, if a prisoner has been recommended to enroll into sex offender therapy and either fails to enroll or does not complete the program, he/she will be considered for parole when the time comes but it is understood that parole will be denied because the hearing will not be meaningful but rather perfunctory.

43.   Therefore, sex offender therapy poses a significant problem for those whom have maintained their innocence of the sex crime for which they stand convicted, because to maintain enrollment into the therapy program a prisoner is required to say that he committed the sex offense even if he did not do so.

44.   If a prisoner was already incarcerated at the time that SORA was enacted but not within a year of being considered for parole, then the prisoner is either automatically designated to enter into sex offender therapy or the offense that he was convicted of is assessed and used to determine whether sex offender therapy is required or needed.

45.   To undergo the risk assessment, prisoners are interviewed by a psychologist who appears to use a Sex Offense Risk Assessment instrument known as Static-99 or Static-99R.

46.   Static-99 was created in 1999 and Static-99R created in 2009 by Dr. Karl Hanson and a colleague.   See, Does v. Whitmer, 751 F.Supp.3d 761, 796 (E.D. Mich.2024).

47.   Static 99 is the most widely used and well-researched sex offense

- 9 -

risk assessment instrument in the world. <u>Whitmer</u>, 751 F.Supp.3d at 796.

48.    Static-99 groups individuals into five levels of risk for sexual offending, with Level I categorized as the lowest risk category and Level V as the highest risk category. <u>Id</u>.

49.    The assessment is based on ten factors, including, but seemingly not limited too, the nature of the sex-related offense, demographics (including age at release and relationship history), sexual criminal history, and general criminal history. <u>Id</u>.

50.    The age of the sex offender at the time of the offense seems also, though not required, to be considered during the assessment.

51.    Static-99R appear to use the same assessment criteria, except that (at least) state officials apparently believe that Static-99R is flawed in a number of respects. <u>Id</u>.

52.    Nonetheless, Static-99R is the most widely used Static-instrument within the MDOC, and was the one used against Plaintiff John Doe during his many risk assessments.

53.    It is clear that both Static-instruments were created to "assess the recidivism risk of adult male[s] with a history of sexual crimes ..." <u>Id</u>. (quoting evidence and depositions submitted by the American Civil Liberties Union of Michigan).

54.    However, neither Static-instrument is equipped with assessing the recidivism risk of juvenile offenders, whether or not they have a history of sex crimes.

55.    Nonetheless, Defendants Whitmer, Shipman, and Washington has mandated that the Static-instruments used to assess the recidivism risk of adult offenders also be used to assess the recidivism risk of juvenile sex offenders.

56.    Any questions or factors that juvenile sex offenders cannot answer or

meet because of their young age or lack of experience with life is factored against them during the assessment process.

57.    That approach was used in John Doe's initial assessment ordered by Defendant Shipman and former Parole Board Chairman Michael Eagan on or about June 4, 2020, and July 16, 2020.

58.    Specifically, on or about May 7, 2018, John Doe filed a lawsuit against Defendants Whitmer, Washington, and then Parole Board Chairperson Michael Eagan, and the case was assigned to U.S. District Judge Laurie J. Michelson (Whitmer case).

59.    On October 8, 2019, the Honorable Michelson convened the parties for a mediation hearing in chambers and ordered that a prosecutor from the Oakland County Prosecutor's Office attend.  John Doe attended the hearing via teleconference with Attorney Reynolds A. Brander (P11128).  Attorney Brander was not representing John Doe, but he agreed to appear with John Doe for support.  In the 1990's, the late Senior U.S. District Judge Douglas W. Hillman appointed Brander to represent John Doe in two other lawsuits that were eventually settled.  John Doe and Brander has remained in contact ever since.

60.    The parties failed to settle the case, and John Doe subsequently filed an amended complaint as ordered by the Honorable Michelson, followed by a motion about a month later for a preliminary injunction to enjoin enforcement of the Michigan statute in dispute.

61.    In response, former Parole Board Chairman Michael Eagan, along with Defendant Shipman and other members of Michigan's Parole Board, ordered a risk assessment against John Doe on or about June 4, 2020.

62.    This risk assessment was ordered in an attempt to uncover a risk of re-offending by John Doe to allow Defendants Whitmer, Eagan, and Washington to use it in response to John Doe's motion for preliminary injunctive relief.

- 11 -

63.   A psychologist did not interview John Doe during the June 4th assessment nor did anyone else, and whomever conducted the assessment did not interview John Doe's family, friends, or anyone else such as guards, counselors, or managers whom either knew John Doe or had contact with him for literally years.

64.   However, during the June 4th assessment, John Doe's age at the time of the crime appears to have been taken into consideration during the assessment process.

65.   The assessment failed to yield any evidence or results of sexual re-offending or any other risk of recidivism on John Doe's part.

66.   So, on June 5, 2020, Defendants Whitmer, Eagan, and Washington filed their response in the Whitmer case to John Doe's motion for preliminary injunctive relief.

67.   On or about July 16, 2020, former Parole Board Chairman Michael Eagan ordered another risk assessment against John Doe.

68.   This risk assessment was performed by Psychologist Michelle Norton.

69.   As before, this assessment did not include interviews with John Doe's family, friends, or guards whom either knew or been around John Doe for years. During the assessment, however, Norton was cognizant of John Doe's juvenile status at the time of the crime.

70.   While Norton said that the assessment was ordered to again assess John Doe's "risk of sexual re-offending", she could not find any evidence against John Doe of sexual re-offending of that outside the risk normally associated with a person living in society.

71.   At the conclusion of her assessment, therefore, Norton's report again determined that John Doe posed a low risk of committing another sex offense and also found that John Doe did not qualify or meet the criteria for sex offender

- 12 -

therapy, stating that [John Doe's] Static-99R was "AVERAGE PER COMPAS 2020", Stable-2007 was scored as "Low", and Combined Scores totaled a "Level III".

72.   Norton's report stated: "Mr. [John Doe] was scored on the Static-99R 2016 in November of 2019, which is intended to position offenders in terms of their relative degree of risk for sexual recidivism based on commonly available demographic and criminal history information that has been found to correlate with sexual recidivism in adult male sex offenders.  Static-99R has a moderate accuracy of ranking offenders according to their relative risk for sexual recidivism and is widely accepted by the scientific community and by applied evaluators.  Mr. [John Doe] scored as a AVERAGE risk on the Static-99R 2016."

73.   The Norton report went on to state: "The STABLE-2007 was developed to assess change in intermediate-term risk status, assess needs, and help predict recidivism in sexual offenders.  These risk factors are potentially changeable but endure for months or years.  The STABLE-2007 consists of 13 items and produces estimates of stable dynamic risk based upon the number of stable dynamic risk factors present in any one individual.  Mr. [John Doe] scored as LOW risk on the Stable-2007."

74.   In closing, Psychologist Michelle Norton stated in her report that John Doe's "Static-99R and Stable-2007 scores were reviewed based on official criminal history records provided, as well as a clinical interview conducted on 7/16/2020 in order to verify the accuracy of information contained in the medical record and corrections files.  Based on a review of the risk assessments, interview, and pertinent background history as summarized above, Mr. [John Doe's] level of risk for sexual re-offense is assessed as LEVEL III at this time.  This assessment was completed by examining Mr. [John Doe's] static and dynamic risk factors through a structured interview and a review of his chart and files."

- 13 -

75. Since then, John Doe has used that report during various forms of litigation, as well as been involved in other activities against prison officials.

76. For example, in April of 2022 John Doe filed a juvenile resentencing post-conviction motion in the Sixth Judicial Circuit Court in Oakland County located in Pontiac, Michigan. The motion went before Judge Michael Warren for a hearing.

77. The Oakland County Prosecutor's Office responded on August 24, 2022, filing just the first page of the Norton report in an attempt to mislead Judge Warren into believing that the Norton report showed John Doe posed a high threat of committing another sexual assault if released, even though the Norton report stated the complete opposite.

78. In addition, prosecutors within the Oakland County Prosecutor's Office, including Karen McDonald, Marilyn Day, and Rae Ann Ruddy, also filed in their August 24th responsive pleading a false Special Problem Offender Notice (SPON), stating it was being generated within the Michigan Department of Corrections (MDOC), which falsely accused John Doe of conspiring to murder another prisoner in October of 2021 while residing at the Michigan Reformatory prison located in Ionia, Michigan. They asked Judge Warren to deny John Doe's resentencing motion because of the false SPON.

79. John Doe immediately responded by filing an administrative grievance on September 2, 2022, within the MDOC against prison officials Laura S. Heinritz and Deborah K. Casillas since they were responsible for generating the false SPON.

80. John Doe also filed complaints with the Attorney Grievance Commission against prosecutors Karen McDonald, Marilyn Day, and Rae Ann Ruddy for filing the false SPON before Judge Warren.

- 14 -

81.    Nevertheless, on January 5, 2023, Judge Warren denied John Doe's juvenile resentencing motion.

82.    Following dismissal of the resentencing motion, John Doe filed suit on December 5, 2023, against prosecutors Karen McDonald, Marilyn Day, and Rae Ann Ruddy, in addition to Laura S. Heinritz and Deborah K. Casillas.

83.    While that suit was eventually dismissed on lack of clarity grounds, John Doe continued to pursue the matter and litigate the Norton report.

84.    For example, on or about January 15, 2025, John Doe filed a Writ of Habeas Corpus in federal court that was assigned to U.S. District Judge Mark A. Goldsmith.

85.    On or about February 7, 2025, John Doe filed motions in that habeas action and indicated an intent to use the Norton report to argue that the length and continued extent of his incarceration was inconsistent with the findings of the psychological risk assessment.

86.    In the interim, on November 2, 2024, Attorney Reynolds A. Brander (P11128) filed a request with the Oakland County Prosecutor's Office seeking copies of any documents pertaining to the prisoner that prison officials accused John Doe of trying to murder.

87.    In addition, on November 24, 2024, John Doe's cousin Professor Angela D. Olivera contacted the MDOC and also requested copies of any reports or documents about the prisoner that prison officials alleged that John Doe conspired to murder.

88.    These requests were never responded too, but John Doe continued to press prison officials about the false SPON and litigate the Norton report.

89.    On or about August 11, 2025, John Doe also filed a state writ for habeas corpus in the 40th Judicial Circuit Court located in Lapeer, Michigan.

90.    As in other legal challenges, in state court John Doe challenged his

- 15 -

continued incarceration and indicated an intent to use the Norton report as evidence to demonstrate the excessiveness of the criminal sentence imposed.

91.   Like the federal habeas corpus writ, the state habeas corpus writ was filed with Michigan's Attorney General's Office to respond on behalf of state prison officials.

92.   On August 22, 2025, John Doe filed another administrative grievance within the MDOC against Heinritz, Casillas, and others for the filing of the false SPON previously mentioned.

93.   On or about September 9, 2025, a very serious investigation was launched within the MDOC into the circumstances surrounding the false SPON.

94.   The investigation involved members from the MDOC's Deputy Director's Office, people from the Thumb Correctional Facility, and other MDOC personnel.

95.   Around this same time, Attorney H. Steven Langschwager (P52380), of the Attorney General's Office, filed a response dated September 8, 2025, with the 40th Judicial Circuit Court to John Doe's state writ of habeas corpus.

96.   In addition, on or about September 10, 2025, Defendants Washington and Shipman ordered another risk assessment against John Doe (September 10th assessment).

97.   The reason for the assessment was not revealed to John Doe, but it is clear that it was not ordered in preparation to consider John Doe for parole or for any other reason that a risk assessment is usually ordered against a prisoner.

98.   In stead, the risk assessment was ordered to determine a way to discredit John Doe and the Norton report.

99.   It is unclear whether the September 10th order for an assessment included an actual assessment by a psychologist using only John Doe's charts and files, or whether it was an order to conduct another in-person assessment.

- 16 -

100.   If the September 10th order was for an in-person assessment, then John Doe was not interviewed at that time, nor did any person interview John Doe's family, friends, or others whom know or been around John Doe for years.

101.   Nevertheless, the September 10th assessment again resulted in a determination that John Doe presented a low recidivism risk and, therefore, did not qualify or meet the criteria for sex offender therapy, evidenced by prison officials' continued reports and documents placed in John Doe's prison files indicating that John Doe did not qualify for sex offender therapy.

102.   As for the SPON, on September 16, 2025, John Doe spoke to Prison Counselor Amie Jenkins about the administrative grievance about the SPON, and she sent emails to the MDOC's Main Office raising concerns, specifically with Heinritz and others.

103.   On or about September 19, 2025, Jenkins contacted the Chippewa Correctional Facility and spoke to the prisoner who Heinritz and Casillas accused John Doe of conspiring to murder, and during the interview, which was recorded, the prisoner repeatedly referred to John Doe as a "nigger" and seemed very upset with John Doe.  This interview was part of the investigation into the false SPON.

104.   At the conclusion of her investigation, Jenkins was unable to uncover any evidence that John Doe indeed conspired to murder the prisoner in question.

105.   Therefore, on or about September 30, 2025, Jenkins filed a report with Warden Fredeane Artis and Acting Deputy Warden J. Lavigne recommending that the false SPON be removed from John Doe's prison files.

106.   A copy of that report was filed with the MDOC's Main Office in Lansing and with the MDOC Deputy Director's Office, at which time Warden Artis requested that the SPON be removed.

107.   On or about October 13, 2025, Warden Fredeane Artis contacted Jenkins to summon John Doe to Jenkins' office, and at this time informed John Doe that the MDOC's Deputy Director's Office ordered prison officials to remove the false SPON from John Doe's prison files.

108.   The actual removal of the false SPON appears to have been the responsibility of Heinritz, since she was initially responsible for initiating the filing and dissemination of the SPON.

109.   However, it seems that prison officials, including, but not limited too, Heinritz, refused to remove the SPON as ordered.

110.   In the meantime, John Doe continued to press state officials over his continued incarceration and this time electronically filed a brief amicus curiae on October 10, 2025, in the case of People v. Eads before the Michigan Supreme Court.   See, Supreme Court Case No. 168205.   Earlier, the Michigan Supreme Court granted the state's application for leave to appeal the Court of Appeals' January 16, 2025 decision in the Eads' case.

111.   On the same date, a copy of John Doe's amicus curiae brief was electronically served on Michigan's Attorney General's Office, the Wayne County Prosecutor's Office, the Defendants' attorneys, and organizations for prosecutors and criminal defense attorneys.

112.   On October 15, 2025, the Michigan Supreme Court accepted for filing John Doe's brief amicus curiae, though denied John Doe oral argument.

113.   Soon after, Defendants Washington and Shipman ordered another risk assessment against John Doe on October 21, 2025 (October 21st risk assessment).

114.   As before, this assessment was not ordered to prepare John Doe for parole consideration or for any other reason that a risk assessment is usually ordered against a prisoner.

115.   In stead, the risk assessment was ordered to determine a way to

discredit John Doe and the Norton report.

116. The October 21st risk assessment was conducted in-person by Defendant Granish, who stated that the assessment was ordered by the Michigan Parole Board.

117. The scheduling of the October 21st assessment was odd and way outside the ordinary, because it is typically not done unless information is received by prison officials in the MDOC's Main Office bearing upon something of a sexual nature that could effect or trigger a change in the conclusion reached in the July 16th assessment that was conducted by Michelle Norton.

118. Nothing had occurred since the July 16th assessment conducted by Michelle Norton that would change the conclusion that she reached.

119. The only thing that was occurring was John Doe's legal activities to use the Norton report in legal arguments and John Doe's activities to remove the false SPON as previously described above.

120. Based on information and belief, the only person who could have authorized not just the October 21st assessment but also the multiple risk assessments that John Doe had undergone since July 16, 2020, following the filing of the Whitmer case is the Parole Board Chairperson and the MDOC Director, being Brian Shipman and Heidi Washington, respectively.

121. Based on information and belief, Shipman and Washington usually would act to authorize those multiple risk assessments if they were acting inappropriately, or if they learned of or were provided with information from or asked to do so by the classification director within the MDOC's Main Office, who was at all relevant times herein Laura Heinritz.

122. The October 21st assessment occurred over a computer terminal in the healthcare unit at the Thumb Correctional Facility (TCF) through a video-feed or video-link; John Doe was at TCF and Defendant Granish was located at the

- 19 -

Lakeland Correctional Facility (LCF) in Coldwater, Michigan.

123.  In addition to the October 21st assessment being highly unusual, the manner in which the assessment was conducted and the appointment of Defendant Granish to conduct the assessment was also highly unusual because the videofeed or videolink is believed not to have been secure and there were psychologists at TCF whom were qualified and available to conduct the assessment themselves.

124.  During the assessment, Defendant Granish asked John Doe adult-style questions that it was obvious John Doe would not be able to answer because of his young age at the time of coming to prison, coupled with his lack of experience with life and intimate relationships, including, but not limited too, questions about whether John Doe has ever been in a bar, strip club, been involved in adult-style relationships in society, been intimate with a woman, his level of employment, and other questions.

125.  Defendant Granish also commented on the nature of John Doe's legal activities, commenting that John Doe was not litigating the merits of the sex crime involved with his criminal case, but only challenging the length of the sentence imposed.

126.  John Doe has never discussed at length the nature of his legal activities concerning the sex crime for which he was convicted of or legal concerns over the length of the sentence imposed with Defendant Granish, with any of the Defendants, or with prison officials at all.

127.  At the conclusion of this risk assessment, Defendant Granish recommended that John Doe enroll into sex offender therapy and also increased John Doe's level of recidivism risk, which moved John Doe from a low risk of sexual re-offending to a high risk of sexual re-offending.

128.  Defendant Granish's conclusion was not based on any new information received or change in John Doe's status different from what was already taken

into consideration and assessed by Michelle Nortion.

129.   In fact, although Defendant Granish commented on John Doe's loved ones, friends, and support system, he declined to speak with John Doe's family, friends, or those who know or are familiar with John Doe and his character like prison guards who have been observing John Doe for years.

130.   Further, Defendant Granish failed to account for John Doe's age or any of the other factors that are typically associated with juvenile offenders at the time of the crime, such as their underdeveloped sense of responsibility, immaturity, impulsivity, and other factors.

131.   Nor did Defendants Whitmer, Washington, or Shipman enact any laws, rules, policies, or procedures requiring Defendant Granish to treat John Doe's age and the other juvenile factors as mitigating any findings or conclusions reached during risk assessments, such as the recommendation that John Doe enroll into sex offender therapy or other programs.

132.   Defendant Granish issued a report although he was not authorized to do so, and the report's scores were based on matters that were counted against John Doe because of the inability to answer questions that only an experienced adult living in society would be able to answer.

133.   While Defendant Whitmer has enacted laws that mitigates or requires state officials to treat juvenile sex offenders different from and less severe than adult sex offenders, she has never enacted laws nor required Defendants Shipman and Washington to treat juvenile sex offenders different from adult sex offenders for purposes of conducting sex offender risk assessments which determines enrollment in sex offender therapy, parole, or governing an increase in risk assessment levels.

134.   The risk assessment level increase and recommendation for John Doe to enroll in sex offender therapy directly resulted from John Doe's continued

challenge to his imprisonment by the filing of legal papers in Michigan's state and federal courts, use of the Norton report to support his argument, and his activities challenging the false SPON.

STATEMENT OF CLAIMS

COUNT I

<u>RETALIATION</u>

135. Plaintiff John Doe hereby states below Paragraphs 1-134 as if such allegations were fully set forth herein.

**a.  Defendants Shipman and Washington**

136. Defendants Shipman and Washington retaliated against John Doe by ordering the October 21st assessment to manufacture an unwarranted increase in the level of John Doe's recidivism risk and a recommendation to enroll into sex offender therapy, because John Doe was using the Norton report to argue that his recidivism risk and the severity of the crime were to low to qualify him for rehabilitation programming like sex offender therapy, to justify the criminal sentence that he is serving, and because of challenges to the false SPON.

137. Defendants Shipman and Washington knew about these arguments advanced by John Doe because attorneys that were representing them and other state officials in court proceedings informed them about the arguments.

138. Moreover, Defendants Shipman and Washington could not help but know about not only John Doe's arguments as aforedescribed but also about the Norton report because the circumstances surrounding John Doe is very rare in that he is considered one of very few prisoners convicted of a sex offense and serving prison time in Michigan, and considered one of very few juvenile sex offenders, if not the only one, whom has served nearly 40 years in prison for a sex

offense whose severity coupled with a recidivism risk is considered to low to qualify him for sex offense therapy and other related rehabilitation programs.

139.    The actions of Defendants Shipman and Washington in ordering the October 21st assessment to manufacture an increase in John Doe's level of recidivism and a recommendation for him to enroll into sex offender therapy constituted retaliation and violated the First Amendment to the United States Constitution made possible to the states through the 14th Amendment.

140.    The actions of Defendants Shipman and Washington in ordering the October 21st assessment after prior multiple assessments failed to yield the results that they were seeking as previously described and because John Doe was using the conclusions of the prior assessments in legal arguments against the sentence that he is serving, constituted retaliation and violated the First Amendment to the United States Constitution made possible to the states through the 14th Amendment to the United States Constitution.

141.    As a direct and proximate result of the actions of Defendants Shipman and Washington, John Doe underwent an assessment on October 21, 2025, that increased the level of his recidivism risk, and, which until now, has never recommended that he enroll into sex offender therapy.   These actions taken now in the "12th hour" of John Doe's incarceration will result in an enormous and negative impact on John Doe's life, including, but not limited too,:

    a.  John Doe will be forced to choose either to drop out of college in order to comply with the sex offender therapy recommendation or disregard it.  If John Doe drops out of college, he will not be able to get or earn credits toward a Bachelor's Degree.  If John Doe chooses not to drop out of college, he is likely to be denied a parole because he did not enroll into sex offender therapy;

b.  John Doe is a juvenile offender who has been incarcerated his entire adult life.  As a result, John Doe has no real-life experiences such as having a career, surviving in society, maintaining a living, or doing any of the other things that adults do in order to function in society.  As a result, if John Doe reenters society without at least a Bachelor's Degree, his chances of survival is dramatically decreased;

c.  If John Doe does not comply with the sex offender therapy recommendation at this last hour of his incarceration, John Doe may never be able to get off of the Sex Offender Registry assuming that he has to register as a sex offender.  Under the 2021 Sex Offender Registration Act, if John Doe has to register as a sex offender upon release, he can only petition for removal from the registry if, among other things, he has successfully completed a sex offender treatment program.  See, MCL § 28.728c(1), (12); see also, Does, 751 F.Supp.3d at 812 notes 48-49.

### b.  Defendant Granish

142.  Defendant Granish retaliated against John Doe by conducting and publishing results in connection with the October 21st assessment on behalf of, in concert with, and as directed by Defendants Shipman and Washington as previously described as a result of John Doe's legal activities as previously described and his complaints about the false SPON.

143.  The manner in which Defendant Granish conducted the October 21st assessment was meant to be in a retaliatory manner and intended to change the conclusion reached by Michelle Norton in a prior assessment per the wishes of Defendants Shipman and Washington, and in order to manipulate the result as previously described he intentionally refused to factor into the assessment John Doe's age, background, and attendant characteristics of youth at the time of the offense, as well as the severity of the crime that prior professional(s) factored into prior assessments involving John Doe.

144.  In order to manufacture a referral for John Doe to enroll into sex offender therapy and an increase in his level of recidivism risk, Defendant Granish intentionally refused to factor into the risk assessment the mitigating qualities of John Doe's youth, John Doe's lack of adult life experiences, and

- 24 -

intentionally asked John Doe adult-style questions that he knew John Doe would not be able to answer because he had no adult life experiences in society.

145.   The actions of Defendant Granish in conducting the October 21st assessment in the manner as described above, including, but not limited too, manufacturing for Defendants Shipman and Washington an increase in John Doe's level of recidivism risk and a recommendation for him to enroll into sex offender therapy, asking questions that he knew John Doe would not be able to answer, and deliberately refusing to factor into the assessment John Doe's age, background, the characteristics of youth, and severity of the offense constituted retaliation and violated the First Amendment to the United States Constitution that is made possible to the states through the 14th Amendment.

146.   As a direct and proximate result of the actions of Defendant Granish, John Doe underwent an assessment on October 21, 2025, that increased his level of recidivism risk and which, after years of recommendations that enrollment into sex offender therapy was not necessary, has now resulted in a recommendation that he enroll into sex offender therapy.   These actions taken now in the "12th hour" of John Doe's incarceration will result in an enormous and negative impact on John Doe's life, including, but not limited too,:

a.   John Doe will now be forced to choose either to drop out of college in order to comply with the sex offender therapy recommendation or disregard it.  If John Doe drops out of college, he will not be able to get or earn credits toward a Bachelor's Degree.  If does not drop out of college, the parole board will deprive him of a meaningful opportunity to be considered for parole and perfunctorily deny the request for parole.

b.   John Doe is a juvenile offender who has been incarcerated his entire adult life.  As a result, John Doe has no real-life experiences such as having a career, surviving in society, maintaining a living, or doing any of the other things that adults do in order to function in society.  As a result, if John Doe reenters society without at least a Bachelor's Degree, his chances of survival is dramatically decreased;

c. In addition, if John Doe does not comply with the sex offender therapy recommendation at this last hour of his incarceration, John Doe may never be able to get off of the Sex Offender Registry assuming that he has to register as a sex offender.   Under the 2021 Sex Offender Registration Act, if John Doe has to register as a sex offender upon release, he can only petition for removal from the registry if, among other things, he has successfully completed a sex offender treatment program if the program is determined to be necessary.   See, MCL § 28.728c(1), (12); see also, Does, 751 F.Supp.3d at 812 notes 48-49.

## C O U N T   I I
### 14th AMENDMENT VIOLATION

147.   Plaintiff John Doe hereby states below Paragraphs 1-134 as if such allegations were fully set forth herein.

148.   As previously stated, the instruments and process authorized to be utilized by Defendants Whitmer, Washington, and Shipman to conduct the October 21st sex offender risk assessment against John Doe was designed specifically for adult sex offenders, particularly being Static-99 and/or Static-99R instruments and the Stable-2007 instrument used to assess change in intermediate-term risk status, assess needs, and help predict recidivism in adult sex offenders.

149.   This process also included John Doe being interviewed by Defendant Granish who has experience and training only in assessing and moderately predicting in adults the risk of committing another sexual assault based on the adult's background.

150.   Defendant Granish and the instruments he used during the October 21st assessment were not geared toward assessing the risk of juvenile sex offenders committing another sex crime or posing any danger to society, and, therefore, such instruments and/or mental health professional did not account for the mitigating qualities of youth in or during the assessment process.

151.   Furthermore, the process used in the October 21st sexual offender

- 26 -

risk assessment process had nothing in place to assist or train evaluators or Defendant Granish to recognize the mitigating qualities of youth in juvenile sex offenders like John Doe at the time that he committed his crime, and, therefore, Defendant Granish did not make proper adjustments in the process in order to properly evaluate John Doe.

152. As such, the process used on October 21st by Defendant Granish as authorized by Defendants Whitmer, Washington, and Shipman to assess the risk that John Doe posed to commit another sex offense produced improper conclusions as previously described at the end of the risk assessment process, especially given the moderate accuracy of the instruments used to begin with, and that resulted in the recommendation, requirement, and/or burdens being imposed on John Doe that, if not complied with, would result in the Michigan Parole Board considering John Doe for parole in a perfunctory manner with the end result being a denial of parole.

153. These actions as previously described set in motion by Defendants Whitmer, Washington, Shipman, and Granish will result in John Doe being deprived of a meaningful consideration for parole and, therefore, deprived of his protected liberty interest in a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation as provided for by the 14th Amendment to the United States Constitution and Article 1, § 17 of the 1963 Michigan Constitution.

COUNT III

GROSS NEGLIGENCE & ORDINARY NEGLIGENCE

154.    Plaintiff John Doe hereby states below Paragraphs 1-134 as if such allegations were fully set forth herein.

a.    Negligence As To Whitmer, Washington, & Shipman

155.    John Doe is currently and has been for nearly 40 years under the jurisdiction of the MDOC for crimes committed when he was a juvenile, including, but not limited too, criminal sexual conduct.

156.    As a result, John Doe is under the care and custody of Defendants Whitmer, Washington, and Shipman.

157.    Defendants Whitmer, Washington, and Shipman owed John Doe a legal duty to apply the knowledge, skill, and ability that a reasonable person employed as corrections officials and in their position, power, and authority would exercise under the circumstances to care for his physical and mental well-being, particularly, though not limited too, to protect John Doe from harm as a result of actions from a third party who holds himself out to be a licensed health care professional, including, but not limited too, a psychologist performing sex offender risk assessments.

158.    Defendants Whitmer, Washington, and Shipman breached that duty when they allowed Defendant Granish to perform the October 21st risk assessment though he was not qualified to do so because he lacked the experience and training to account for the mitigating qualities of youth during such assessment which negligently caused Defendant Granish to refer John Doe to enroll into sex offender therapy and increase John Doe's risk of recidivism.

159.    As a direct and proximate result of the actions of Defendants Whitmer, Washington, and Shipman, John Doe will be deprived of a meaningful opportunity to obtain release because he must now choose to either drop out of

- 28 -

college in order to enroll into sex offender therapy or disregard it. If John Doe does not drop out of college and enroll into sex offender therapy, the Michigan Parole Board will not grant him a parole. If John Doe does drop out of college and enroll into sex offender therapy, the Michigan Parole Board will not grant him a parole either because John Doe will not be able to obtain a Bachelor's Degree and, therefore, John Doe will not have the tools that will be needed for someone in his position to succeed if released on parole.

### b.  Gross & Ordinary Negligence As To Defendant Granish

160.    Defendant Granish is a limited licensed psychologist who must be supervised by a fully licensed psychologist when performing any type of evaluations, including but not limited to risk assessments.

161.    On or about October 21, 2025, Defendant Granish was directed or paid to conduct a sexual offender risk assessment on John Doe in order to determine the level of risk that John Doe had to commit another sex crime, and, based on his determination, Defendant Granish was paid to determine the course of treatment for John Doe, including, but not limited too, enrollment into sex offender therapy.

162.    Before conducting the risk assessment, Defendant Granish knew or reasonably should have known that John Doe was a juvenile at the time that he committed the sex crime for which he is currently serving prison time.

163.    Yet, notwithstanding that knowledge as well as not having the authorization, training, or experience to evaluate juvenile sex offenders, Defendant Granish performed the risk assessment as heretofore described at the direction of Defendants Whitmer, Washington, and Shipman.

164.    Defendant Granish carelessly performed the October 21st risk assessment because, among other things, he asked John Doe adult-style questions as previously described that he knew or reasonably should have known that John

- 29 -

Doe would not be able to answer since he was incarcerated at such a young age, and Defendant Granish did not factor into the risk assessment or the conclusion that he reached the mitigating qualities of John Doe's youth.

165.    During the risk assessment, Defendant Granish was not being supervised by a fully licensed psychologist and at the conclusion of the risk assessment Defendant Granish authored a report called a Sexual Offender Risk Assessment where he recommended or knew that it would result in John Doe having to enroll into sex offender therapy.

166.    As a limited licensed psychologist, Defendant Granish did not have authorization to author his own reports about John Doe or anyone else, and/or such reports had to be signed off on by a fully licensed psychologist.

167.    Nonetheless, at the conclusion of the risk assessment, Defendant Granish authored a false report, or prepared a report that was not signed off on or approved by a fully licensed psychologist, which included an increase in John Doe's level of risk to commit another sex offense, as well as a referral for John Doe to enroll into sex offender therapy.

168.    As a direct and proximate result of the actions of Defendant Granish, John Doe suffered an improper and false increase in his level of risk to commit another sex offense and required to undergo sex offender therapy after nearly forty years of being convicted of a sex offense. If compelled to enroll into sex offender therapy, John Doe will be forced to drop out of college and, therefore, sacrifice pursuing a Bachelor's Degree in Business.

## RELIEF  REQUESTED

WHEREFORE, for the foregoing reasons, Plaintiff requests and prays that this Honorable Court: (i) find that the Defendants' failure to account for the mitigating qualities of youth during sex offender risk assessments is unconstitutional as applied to Plaintiff; (ii) enter permanent injunctive relief requiring the Defendants when assessing John Doe to account for the mitigating qualities of youth during sex offender risk assessments and to use evaluators during the process whom are trained to do so; (iii) strike down the October 21st risk assessment as unconstitutional and require the Defendants to either abide by the July 16th risk assessment or conduct another one that comports with constitutional guarantees; (iv) grant John Doe damages against the Defendants in excess of $100,000 for violating John Doe's rights as previously described; and (v) grant John Doe the costs of this action and any other relief as this Court deems just.

## VERIFICATION  &  AFFIDAVIT

I hereby swear that the statements made in this Complaint are being made under the penalty of perjury, except with regard to allegations of law in which case they are being made based on information and belief.

Subscribed and sworn to before me this 29th day of December , 2025.

_____
NOTARY PUBLIC

VERNON E. GAITER
NOTARY PUBLIC, STATE OF MI
COUNTY OF SAGINAW
MY COMMISSION EXPIRES Jan 16, 2031
ACTING IN COUNTY OF Lapeer

Respectfully Submitted,

_____
Michael A. Kitchen (#189265)
Plaintiff Proceeding Pro Se
Thumb Correctional Facility
3225 John Conley Drive
Lapeer, Michigan  48446

Dated: January 14, 2026 (mailed)

- 31 -

FIRST-CLASS



US POSTAGE PITNEY BOWES

ZIP 48446   $ 003.84
02 7W
0008038245 JAN 15 2026

RECEIVED
JAN 21 2026
CLERK'S OFFICE
U.S. DISTRICT COURT

Michael A. Kitchen (#189265)
Thumb Correctional Facility
3225 John Conley Drive
Lapeer, Michigan  48446

§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§
§§                                                     §§
§§                                                     §§
§§   MAIL TO:  CLERK OF THE COURT                       §§
§§             UNITED STATES DISTRICT COURT             §§
§§             THEODORE LEVIN U.S. COURTHOUSE           §§
§§             231 W. LAFAYETTE BLVD., ROOM 564         §§
§§             DETROIT, MICHIGAN 48226                  §§
§§                                                     §§
§§                                                     §§
§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§

RECEIVED